J-A26043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRYCE ASHTEN JANKEY | : | |
| | : | |
| Appellant | : | No. 524 WDA 2024 |

Appeal from the Judgment of Sentence Entered April 16, 2024
In the Court of Common Pleas of Bedford County Criminal Division at
No(s): CP-05-MD-0000029-2024

BEFORE: BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: November 7, 2024**

Appellant, Bryce Ashten Jankey, appeals from the judgment of sentence of 6 months' incarceration, imposed after the trial court convicted him of indirect criminal contempt (ICC) based on his violating a Protection From Abuse (PFA) order issued in a Maryland Circuit Court. Herein, Appellant challenges the sufficiency and weight of the evidence to sustain his ICC conviction, and also alleges that his sentence is excessive. After careful review, we affirm.

Appellant's conviction of ICC stemmed from the following evidence. Miranda Love, Appellant's former paramour and mother of his 2-year-old child, testified that she had a PFA order against Appellant. The order prohibited Appellant from being at Love's residence or contacting her for any reason other than issues regarding their child or custody matters. *See* N.T. Hearing, 4/16/24, at 6, 7; *id.* at 15. According to Love, on April 6, 2024, Appellant

had their 2-year-old son in his custody, and called Love saying that her son was asking for her. *Id.* at 18. A short time later, Appellant arrived at Love's home with the child and knocked on Love's door. *Id.* at 8.

Love testified that she "opened the door and asked [Appellant] what he was doing [there] and he just basically said [her] kid wanted [her]." *Id.* Love said that she "grabbed [her] child and went to go and shut the door[,]" but Appellant "entered into [her] house…." *Id.* At that point, Love left her home and "went down the steps" to a restaurant, as she wanted to be in a public area. *Id.* Love explained that Appellant followed her into the restaurant, so Love went back to her home, locking the door behind her. *Id.* at 10. She testified that Appellant then started "bang[ing] on [her] door." *Id.* Love ultimately came outside with her child to put him in the car of a male family member who had arrived to take the child while Love went to work, at which point Appellant took the child and "tried running down the hill…." *Id.* at 12. Love testified that as Appellant ran with the child, the child's body came "within inches of the dumpster that was there, almost hit[ting] … off of it." *Id.* Ultimately, Appellant stopped and gave Love the child, after which he left. *Id.*

On cross-examination, Love admitted that she had consensually had non-custody-related contact with Appellant after the PFA order was in effect. *Id.* at 17. She also admitted that she had allowed Appellant to come to her home and spend the night approximately three times since the PFA order went

- 2 -

into effect. *Id.* at 17-18. The most recent of these visits was approximately two months before the incident at issue herein. *Id.* at 18.

The Commonwealth also called Ashley Fetter, a family friend of Love's. *Id.* at 22. Fetter testified that Love called her via FaceTime as the incident with Appellant was occurring, and Fetter could hear Appellant "banging on the door and yelling." *Id.* at 23. On the video call, Fetter saw Love go outside, at which point Appellant was "screaming [at] her, [and] calling her a whore." *Id.* at 24. Fetter also said that Appellant was "calling [Love] names and saying things about how she went out [the] night [before] and she was sleeping with this person and that person." *Id.* Fetter testified that she saw Appellant "trying to run" with his and Love's child in his arms. *Id.* at 25-26.

Based on this testimony, the trial court convicted Appellant of ICC. That same day, the court sentenced Appellant to six months' incarceration. Appellant filed a timely, post-sentence motion challenging the sufficiency and weight of the evidence to support his ICC conviction, as well as the discretionary aspects of his sentence. After a hearing on May 3, 2024, the court denied Appellant's post-sentence motion. He filed a timely notice of appeal, and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed a Rule 1925(a) opinion on May 24, 2024. Herein, Appellant states four issues for our review:

I.  Whether the trial court erred by ruling that the Commonwealth had met its burden of proof beyond a reasonable doubt and by finding Appellant guilty of [ICC] in

that the evidence presented by the Commonwealth was insufficient to establish that Appellant was present at the alleged victim's residence in violation of the [PFA] order at issue?

II. Whether the trial court erred by ruling that the Commonwealth had met its burden of proof beyond a reasonable dount [*sic*] and findnig [*sic*] Appellant guilty of [ICC] in that the evidence presented by the Commonwealth was insufficient to establish that Appellant was engaging in contact with the alleged victim that did not pertain solely to the parties' child custody arrangements in violation of the [PFA] order at issue?

III. Whether the trial court erred by ruling against the weight of the evidence presented by the Commonwealth at the hearing on his alleged violation of the [PFA] order at issue as it was so lacking as to shock the conscious [*sic*] in that the witnesses presented by the Commonwealth lacked credibilty [*sic*] in their testimony to support the allegations against Appellant?

IV. Whether the trial court erred by imposing an excessive sentece [*sic*] of the maximum allowable period of incarceration of six (6) months wherein [the trial] court failed to order a presentence investigation and failed to take into account mitigation information pertainng [*sic*] to [Appellant] including, but not limited to his employment status, his partial physical custody of his only child, his obligation to provide financial support to his child and his lack of a criminal history?

Appellant's Brief at 9-10 (unnecessary capitalization omitted).

Appellant's first two issues are related and, therefore, we address them together. Appellant contends that the evidence was insufficient to prove that he violated the PFA order. He stresses that the order permitted him to contact Love, and be at her home, for the purpose of addressing custody issues or communicating about their child. According to Appellant, on April 6, 2024, he was only at Love's home because their son wished to see her, and he only

- 4 -

communicated with Love about their child during the at-issue incident. Thus, he contends that his conduct did not violate the PFA order.

To the extent that Love and Fetter testified that Appellant's contact with Love went beyond communicating about their son, Appellant claims that their testimony should have been deemed incredible. He stresses that Love admitted "to picking and choosing when to follow" the PFA order, which makes her testimony unbelievable as a whole. *Id.* at 17. Appellant also argues that "Fetter's testimony was not from her own first-hand experience[,] as she was not present on scene at the time of the alleged violation of the [o]rder[,]" and she was also "biased and ha[d] a motive to support [] Love's contentions." *Id.* at 17-18. Accordingly, Appellant concludes that the credible evidence was insufficient to prove that he violated the PFA order and committed ICC.

We disagree. First, our Supreme Court has explained:

> In order to establish a claim of indirect criminal contempt, the evidence must be sufficient to establish the following four elements:
>
> > (1) the order must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited; (2) the contemnor must have had notice of the specific order or decree; (3) the act constituting the violation must have been volitional; and (4) the contemnor must have acted with wrongful intent.

*Commonwealth v. Baker*, 766 A.2d 328, 331 (Pa. 2001) (internal citations omitted).

Presently, Appellant seemingly challenges the third and/or fourth elements of establishing ICC, claiming that he did not intentionally violate the

PFA order because he only was at Love's residence to communicate with her about their child, which was permitted by the PFA order. However, the trial court found that Love's and Fetter's testimony that Appellant was "angry, upset, pounding on the door, yelling, calling [Love] vulgar names, accusing her of sleeping around, [and] those sorts of things have nothing to do with the minor child. Clearly, it's in violation of the order." N.T. Hearing at 33. The court further concluded that Appellant's "wrongful intent was clearly demonstrated by" his refusing to leave Love's residence and his "yelling, screaming, [and] pounding on [Love's] door." N.T. Post-Sentence Motion Hearing, 5/3/24, at 21. **See also id.** (the court's stating that Appellant's "[s]creaming that [Love's] a whore and accusing her [of] sleeping with other men, clearly demonstrates his wrongful intent"). Although Appellant now argues that the court should not have credited Love's or Fetter's testimony, such a claim goes to the weight, not the sufficiency of the evidence. **See Commonwealth v. Gaskins**, 692 A.2d 224, 227 (Pa. Super. 1997) (stating that "credibility determinations are made by the fact finder and that challenges thereto go to the weight, and not the sufficiency, of the evidence"). Because Love's and Fetter's testimony supports the court's determination that Appellant voluntarily contacted Love about issues not involving the parties' child, and he did so with wrongful intent, Appellant's first two issues are meritless.

Appellant next challenges the weight of the evidence to sustain the court's ICC finding.

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (cleaned up).

Here, Appellant claims that the weight of the evidence did not support the court's ICC finding because Love and Fetter were not credible for the same reasons set forth in his challenge to the sufficiency of the evidence. Namely, Appellant stresses that Love "permitted the parties to have contact that was not in keeping with the [PFA o]rder that she sought against Appellant[,]" even allowing "Appellant to stay at her residence overnight after the [o]rder was put into effect." Appellant's Brief at 23. Appellant avers that Love's admitting

that she previously allowed him to contact her in violation of the PFA order should have rendered her testimony incredible. However, the trial court found that the opposite was true. The court explained that Love's "testimony was … fairly credible, **because she fully admitted** that in the past … there have been times where [she and Appellant] went places together and … on three occasions she asked [Appellant] to come over to spend the night." N.T. Hearing at 32 (emphasis added). The court's credibility determination is not an abuse of discretion.

Moreover, we discern no abuse of discretion in the court's rejecting Appellant's claims that Fetter was biased because of her close relationship with Love, and she was incredible because she was only "monitor[ing] the events between [] Love and Appellant via cell phone." Appellant's Brief at 24, 25. First, Fetter testified that she could see and hear what was happening through the video and audio on Love's phone. Second, the court was aware of Fetter's relationship with Love, and presumably took that into account when assessing her credibility. Accordingly, nothing in the record demonstrates an abuse of the court's discretion in rejecting Appellant's challenge to the weight of the evidence.

Lastly, Appellant contends that the court imposed an excessive sentence by failing "to order a presentence report and fail[ing] to take into account mitigation information pertaining to Appellant including, but not limited to[,] his employment status, his partial physical custody of his only child, his obligation to provide financial support to his child[,] and his lack of a criminal

history." *Id.* at 26. Appellant's argument challenges the discretionary aspects

of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. *Commonwealth v. Sierra*, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

>> We conduct a four part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

> *Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, … 909 A.2d 303 ([Pa.] 2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, … 831 A.2d 599 ([Pa.] 2003).

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra, supra* at 912–13.

*Commonwealth v. Griffin*, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant filed a timely notice of appeal, and he preserved, in his

post-sentence motion, a claim that the court failed to consider certain

mitigating factors. Appellant has also included the following Rule 2119(f) statement in his brief:

> The [trial c]ourt abused its discretion ... by imposing a sentence of six (6) months in the Bedford County Correctional Facility when it failed to consider mitigating evidence and factors presented to it and when it imposed a sentence upon Appellant that exhibits bias, ill will[,] and prejudice that is manifestly excessive and excessively punitive.

Appellant's Brief at 8.

First, Appellant did not preserve, in his post-sentence motion, his arguments that the court sentenced him with bias and prejudice. Thus, that claim is waived. *See Griffin*, 65 A.3d at 936 ("[I]ssues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived.") (citation omitted). Additionally, Appellant's cursory and legally unsupported argument that the court failed to consider the mitigating evidence does not demonstrate that a substantial question exists for our review. "An allegation that the sentencing court failed to consider certain mitigating factors generally does not necessarily raise a substantial question." *Moury*, 992 A.2d at 171 (citations omitted). Appellant fails to explain why in this case, his claim should be construed as a substantial question.

In any event, even if Appellant's claim invoked our review, we would conclude that no relief is due. Initially, we recognize:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006).

Instantly, Appellant complains that the court erred by not ordering a presentence investigation report, and that it failed to consider certain mitigating circumstances in this case. Notably, when the court convicted Appellant and said it was immediately proceeding to his sentencing, Appellant did not object or request a presentence report. Additionally, when the court asked defense counsel if she had "anything else[,]" before it imposed Appellant's sentence, counsel replied, "No, Your Honor." N.T. Hearing at 33. When Appellant was then asked by the court if he wished to speak, Appellant declined. *Id.* Thus, at no point did Appellant present the court with his work history, his lack of a prior criminal record, or his financial obligations in caring for his son. He cannot now complain that the court failed to consider these factors before imposing his sentence.

Moreover, at the post-sentence motion hearing, the court permitted Appellant to develop the record regarding these mitigating factors. Defense counsel discussed Appellant's work history, child support obligations, and the importance of his spending time with his young child. N.T. Post-Sentence Motion Hearing at 6-7. Counsel also stressed that Appellant helps his elderly

grandmother, who has health issues, and that he has no prior criminal history. *Id.* at 7. Furthermore, Appellant apologized to the court and stated that he understood the severity of his violation of the PFA order. *Id.* at 8.

In response, the Commonwealth stressed that Appellant had violated the PFA order and been convicted of ICC multiple times in the past, for which the court had given him a term of probation that he ultimately violated again. *Id.* at 12. The Commonwealth argued that "there's a risk of harm to the victim in this matter" due to Appellant's repeatedly violating the order. *Id.*

After hearing the parties' arguments, the court stated the following:

So, I note that what [defense counsel] raised on behalf of [Appellant] was the fact that he had a job at a place called Timer Ridge and that was in Virginia. Of course, [Appellant], I guess, lives in Maryland, but that he can't get work release for that job and he does not believe he can get a job here in Bedford County such that he could get work release because he doesn't have any contacts here to get a job.

[Defense counsel] also argued that he informally paid some amount in support and that was based upon testimony of [Love] that from time to time he would occasionally give her money. But, I would note it doesn't sound to me as though there is a formal child support order based upon the argument. So, I don't know exactly how much, if any, she's actually getting in support currently. We also heard that [Appellant] exercises some level of partial custody rights and that he has a grandmother who he helps, he helps her. And that he had no prior criminal history other than these, well, multiple violations of this protection from abuse order.

I'd also note that I did hear from the [Appellant]. He apologized for violating the probation in the first violation and he stated that he now understands how serious these violations are.

So, I would indicate that we also discussed this. Last week[,] I heard the other three remaining cases [regarding charges of ICC for Appellant's violating this PFA order]. That would be the

- 12 -

probation revocation case filed at No. 103 for 2023. That's what we termed the first violation. He got probation for that [but] because he committed the second violation, which is this case, that probation was subject to being revoked and re-sentenced. Then while he was in jail, he had two additional violations. If I recall, generally, one was attempting to telephone [Love] from the facility. And then the second one was getting somebody else to try and contact [Love] via, maybe, text message if I recall, again, while he was incarcerated.

So, while, sir, I appreciate the fact that you apologized for violating the probation in that first case and that you now understand how serious these violations are, I hope that you do, sir, but I have strong concerns about that because the last two violations were committed while you were sitting in jail. So, I'm not sure what it's going to take, sir, to get you to understand that you have to follow these [PFA] orders and if you don't[,] the repercussions can be quite strong. But, I would note in terms of the sentence I have in this particular matter, and of course, that was six months of incarceration. I have that due to again, the nature of the violation in that it occurred at her home where you never should have been to begin with. You risked serious harm and bodily injury to the child. That you were yelling, screaming, pounding on her door causing a disturbance. So, I want to state that the reason for the sentence that you got, sir, is based primarily on the nature of the violation and the fact that when I sentenced you to that, this really was a second violation and that I had already tried simply giving you a period of probation to impress upon you how important … compliance with these orders are. And obviously that wasn't enough to get you to understand that these matters are very serious.

So, even in light of the fact that you did have a job and that you exercised partial custody rights, I noted that you indicated that you're sorry. I note that you have a grandma who needs some assistance from time to time, but I would note I didn't hear any evidence as far as what her health issues may be or how much assistance or what type of assistance she requires. So, that all seems rather vague to me. Also, what also seems rather vague is what support, if any, you've been recently giving [Love]. The other thing I want to note as it relates to this job situation, regardless of what I do with this particular sentence today, you've already agreed in the other three cases to do five months of incarceration. So, regardless of what I do or don't do with this

sentence on this reconsideration motion, you're still doing five months of incarceration and you agreed to that.

So, in looking at the sentence, again for the reasons I've already stated both today and at the time I imposed the original sentence, specifically do [*sic*] to the nature of this violation, the fact that you were on probation for a prior violation, those are the reasons that this [c]ourt feels that the sentence imposed was appropriate and I do not intend to modify it today.

*Id.* at 24-28.

Clearly, the court considered the mitigating factors cited by Appellant, but chose to impose a six-month term of incarceration because of the nature of his instant violation, the fact that he has repeatedly violated the PFA order, and because a prior term of probation did not stop his violative conduct. We would discern no abuse of discretion in the court's sentencing decision, even had Appellant raised a substantial question for our review.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/7/2024